May it please the Court, my name is Robert Haney from Covington & Burling, representing the Appellant Roots Ready Made Garment Company, and with the Court's permission, I'd like to reserve two minutes for rebuttal. The key issue in this case is whether the Court erred in delving deep into a complicated factual scenario to apply the parole evidence rule by essentially making factual determinations on a hotly, hotly disputed record. The Court, in its opinion below, acknowledges the correct standard, that all reasonable doubts as to the existence of genuine issues of fact must be resolved against the moving party, and that all inferences to be drawn from those facts must be viewed in the light most favorable to the nonmoving party. However, the Court repeatedly failed to apply that, particularly in the parole evidence context. The parole evidence rule on its face is relatively simple and relatively clear. It says that terms set forth in a writing intended by the parties, by the parties, as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or a contemporaneous oral agreement. That's the end of the rule. It's very clear on its face that this applies to a situation where A and B enter into an oral contract and then later have between themselves a subsequent written contract. But then California sort of muddied the waters there, right, with their decisions that the parole evidence rule could also apply to a party that's a stranger to the contract. That – well, there's nothing in the rule that says that, but there are decisions that in very, very limited circumstances, a stranger to the contract can deploy a parole evidence rule with respect, say, C can use it against A or B. But in almost all cases, Your Honor, that's a situation where C is trying to interpret the contract between A and B. And the most important case, the Kern County case in California, is a situation where the contract of the third party explicitly mentions and refers to the contract between A and B. So you have the Kern County Water District having a contract with the State of California, and that contract is expressly referenced and included in, expressly included in the written contracts with the 20 water districts. When Kern County moved, filed a lawsuit for declaratory judgment against those 20 water districts relating to interpretation of the master contract between it and the State, those water districts were able to use the parole evidence rule with respect to that contract because it related directly to their contract. But here, the GAP-Gabana contract, which is allegedly subsequent to Roots Oral Agreement with GAP, does not in any way reference or mention any agreement between Roots and GAP. And so, therefore, it does not fit within that exception. But doesn't the oral agreement, as indicated by your client, I guess Abu Issa, with GAP, he claims an oral contract, and that agreement, at least according to the testimony, was to be documented in the GAP-Gabana agreement. So it would be the mention goes the other way, I guess, is what the district court was saying. Well, that's precisely where there are very hotly disputed issues of fact. And really what this case comes from, or what this motion comes from, is some admissions that Mr. Abu Issa made in very carefully crafted, narrow questions that make it appear the two things of the case which are hotly disputed. One is that Roots intended to be bound by the GAP-Gabana agreement, and the second is that Roots intended Gabana to somehow represent it in its negotiations with the GAP. However, those are very hotly disputed, and there's a lot of factual evidence to the contrary in the record. If we agreed with the district court that the district court didn't make a mistake in saying the declaration, Abu Issa's declaration, was sham and therefore didn't need to be considered, is there still a genuine issue of material fact about that issue? Oh, absolutely, Your Honor. There are numerous references in the deposition which contradict what GAP is trying to establish on summary judgment. For example, at record 98, Mr. Abu Issa says, I want to, quote, I want to differentiate here between the written and the oral agreement. The oral agreement was directly between GAP and Roots. He says at record 73 that the termination of the GAP-Gabana agreement, quote, does not affect the GAP-Roots agreement, close quote. At 270 at record 274, explaining that Roots refused to sign, he explains, and this is another independent fact, Roots did not sign a mirror agreement or what GABANA wanted him to sign, a mirror agreement between GAP and Roots, Gabana and Roots that mirrored the contract between Gabana and GAP. He's explaining this, and he says, Roots refused to sign the contract with GABANA that mirrored the GAP-Gabana agreement because the terms were more restricted than, quote, what Roots had in the contract with GAP, close quote. Is that from the declaration or is that from the record? No, that's – I believe that's in the deposition. It's 274, and then again at 281, quote, we know that we have a contract with GAP, close quote. But I thought the problem is that there's internal inconsistencies in the deposition. Well, I think – and this really gets to the heart of the issue, Judge Rastani. They appear to be inconsistencies, and this is often the case in trials where there's – where deponents or witnesses seem to make admissions that can be explained. Obviously, I didn't have a chance to give a direct testimony, but there are two ways of interpreting the factual scenario here, and I'll have to back up just a little bit. This all started out when Larson was actually representing GAP, came to the Middle East and was looking to get rid of a huge amount, 1.76 million pieces of excess or liability inventory, which was a huge problem for GAP at the time. And he went trying to sell that to Sheikh Faisal and Mr. Abuisa. Was Larson with GAP? I thought he was with Soka and Gabbana. That's – well, he was with Soka and Gabbana, but he was the first person that came to – he came basically representing GAP and saying GAP will offer you this deal. And that's very clearly in the record. He's saying GAP will offer you this deal. And then when they're having a meeting, they get the GAP representative, Jim Bell,  and only after that conversation do things proceed. And that's – and Mr. Abuisa, throughout his deposition, as well as Sheikh Faisal and another third-party witness, confirmed that at that meeting there was a direct discussion between GAP and Roots, where GAP and Roots agreed to this transaction where they took this $6 million worth of virtually worthless inventory in exchange for a promise to become the ISP dealer for the entire Middle East. But then there's all this testimony that says, yes, we have a deal, but it's going to be done through Gabbana. Right. And it's going to be documented. It has to be in writing, and it's going to be documented through Gabbana. That's – that's what – And that's from – from your client. That's – that's right. And – and what – what happened was that GAP said to Roots, we do not want to proceed for whatever reason with a direct contract with you. There is evidence in the record to suggest that they did not want to proceed directly to contract with a Middle Eastern entity. We don't know the reason why. And so they inserted a new company, Gabbana, which essentially was a shell company with no experience in the garment industry and no facilities in the Middle East, to basically be a middleman between the two parties. Francois Larson, who was – who came to Roots in the first place representing GAP, then became the principal of that middleman company, of that – of that shell company. They had an office in Switzerland. They didn't have any warehouse and certainly no capacity whatsoever to distribute 1.7 million pieces of excess inventory. By the way, Your Honors, but given all this intertwining of the contracts and companies, I'm not sure I see the principal distinction between this case and Kern County. I don't know. There is very much a distinction. I understand the factual distinction you drew previously, but it seems to me that what the district court said in this case is, look, California eliminated the parties and interest rule in 78 from the language. Kern County says strangers – we can apply the rules to strangers to the contract when it's intertwined. This is intertwined. Therefore, it applies. What's wrong with that? Well, because in order to do that, he had to delve deeply into the facts and make factual determinations that should have been the province for the jury. No, I understand that, but I'm not sure that the district court did that. I mean, I think everybody concedes that all of these interactions were, in fact, in some sense intertwined. Do you dispute that? Do you think that – I mean, I don't hear anything in your presentation saying this was a completely different deal that didn't involve any third parties. Well, no, it was a different deal, because the deal – the deal was between Gap and Gabbana, and – I'm sorry. The deal was between Roots and Gap, and Roots then decided that it wanted to proceed through Gabbana as another party, asserting this other party. Roots maintained, and Gap conceded throughout this, and this is in the deposition as well, that the Gap contract with Roots survived and was primary with respect to the relationship between Gap and Roots. And so there was never an assumption or never a belief between the two parties to that initial oral contract, Gap and Roots, that the contract with Gabbana would somehow erase or change any of those fundamental obligations. Now, there is evidence in the record to suggest that. There are deposition statements that suggest that, but there are also deposition statements to the contrary. And then there is an affidavit which clarifies what was said and tries to explain in more detail. And essentially what's going on is Roots is saying, okay, you want to proceed through Gabbana, that's fine. And there's a negotiation. By the way, Roots never got a contract – never got those contracts between Gap and Gabbana until after they were signed. There were some communications with Gabbana relating to the negotiation. But Mr. Abouissa says very clearly that he doesn't even know – he doesn't believe that and didn't know at the time whether Larson was following his instructions. He was giving some input. Now, as a practical matter, between business people – And I'm not going to go into the details of that, because it indicated in the briefing that they never executed the LOU, but I went and looked at it and it was fully executed. So he's – the – Roots signed the letter of understanding with Gabbana, which tracked the Gap-Gabbana agreement. I believe what happened is that they signed something prior to the – prior to the completion of the Gap-Gabbana agreements. There was a Gabbana-Roots agreement that said, we're going to enter into contracts with you that mirror these. But then when Roots saw that the Gap-Gabbana agreements did not reflect its primary agreement with Gap, it refused to sign those agreements because they didn't provide what – what they – Refused to sign what agreements? There were subsequent agreements between – sales agreements between Gabbana and Roots that were anticipated to be signed that never got signed because they – because they tracked the Gap-Gabbana agreements, which did not embody the original oral contract between Gap and Roots. But isn't it the case that – my understanding, at least, was that Roots then performed under the LOU, sent the $5 million or $6 million, whatever it was, to Gabbana for the goods to Gabbana, which then sent it to Gap. So it didn't perform under any separate agreement with Gap. It was performing under – it sent the money to Gabbana rather than Gap, I guess, is the bottom line. Well, Gap basically told Roots at that time that notwithstanding anything in the Gap-Gabbana agreements, the original oral contract still applied. And Roots still wanted to do that deal with Gap, and it figured that Gap can implement that deal in any way it wants if it's got a deficient agreement – if it's got an agreement with Gabbana that doesn't allow it to completely implement that, it will be implemented in some other way. And so it made the payment, implementing the agreement, on the strength of the oral agreement between Roots and Gap. And that's very clearly in the record. I realize there are statements that seem inconsistent with that as well, but that's what trials are about, that basically those inconsistencies can be – can either be or not be explained and clarified, and that's what's for a trier of fact. Do you want to reserve? Yes, Your Honor. Thank you. Can I just ask one more question? Oh, absolutely. I just want to ask you one question. I just want you to assume, arguendo, that your contract and quasi-contract claims fail. What's your – what would be your unfair competition claim if those claims failed? Well, that it's unfair – that it's unfair competition. That was dismissed on the basis that there was no separate unlawful act shown. Those are in the statute or in the disjunctive. Actually, I thought the district judge dismissed it basically for the reason I said in my argument, in my question, and that is that you – if you – he thought you failed on your other claims, right? So he said basically there's nothing left if you fail on those other claims. Yes, Your Honor, but the – But I kind of want to know, theoretically, if you have no contract claim and you have no quasi-contract claim, just what's your basic unfair competition claim? Well, the statute is written in the disjunctive, so it can be unlawful or unfair. And what the judge essentially did was said, if you can't show something that's unlawful or a breach of contract, I'm not going to let you go down the road of unfair. There is a very clear standard under California law of what unfair means, and it is often applied in situations where there has been no breach of contract or no breach of any other law, but because of the – So what was unfair? Well, that basically they tricked Roots into this transaction to give them $6 million for virtually worthless inventory on the – knowing that Roots believed it was going to be the – an ISP dealer for the Middle East, and knowing – and knowing, as they admitted, that they never intended to do that. Okay, counsel, we'll give you some time for a couple of questions before taking you over. Okay. Thank you very much. Good morning. Daryl and Dury of Hearing for the Gap. This Court does not need to reach the outer boundaries of the application of the parole evidence rule in the context of third parties to a contract in order to affirm the judgment below for three independent reasons. First, the contractual relationship between the parties was set forth in two interlocking agreements. One, the letter of understanding that was executed on May 12th between Roots and Gabbana, which explicitly referenced the fact that Gabbana and not Roots had been afforded the opportunity to enter into an ISP distribution agreement with Gap, and that Roots would be purchasing ultimately that inventory, the excess inventory, from Gabbana, not from Gap. The following day, Gap and Gabbana enter into the contract that is referenced in that letter of understanding. The excess inventory that Roots contends was the subject of its oral agreement with Gap is the same excess inventory that is the subject of those two interlocking written agreements. And therefore, as in Kern County, these are related transactions. In fact, Roots characterized them in a brief filed with the Court that is within the excerpts of record as being the same transaction. And in that circumstance, parole evidence rule operates to preclude Roots from relying on the existence of an oral contract that is inconsistent with what was set forth in those two written agreements, one of which it was a party to. The second independent reason is that Mr. Larson acted as Roots's agent, and he was both actual and ostensible in the negotiation of the agreement between Gap and Gabbana. This is not simply a matter of oral testimony at deposition, though the oral testimony at deposition was clear on this point. It is also what Roots originally alleged in its complaint in this action, an allegation that was reaffirmed by Mr. Abu-Issa at his deposition. And it is also confirmed by a written document from Roots to Mr. Larson setting forth the terms of the proposed deal that Roots would be willing to enter into and requesting Mr. Larson to negotiate and transmit that to the Gap. I had some trouble with this agency theory, because it seemed like Larson was acting on behalf of Gabbana. He negotiates a deal between Gabbana and Gap, and there's nothing in the deal he negotiates that binds Roots in any way. So it wasn't clear to me how Larson could be deemed to be an agent of Roots when nothing that Larson did bound Roots in any way. It is true that Mr. Larson's agreement with Gap did not bind Roots, but it defined the rights to which Roots would be entitled pursuant to its letter of understanding with Gabbana. So Roots had entered into an agreement that it would purchase ultimately the product that Gabbana was going to receive from Gap. That agreement between Roots and Gabbana reflected the fact that Roots and Gabbana would enter into further written contracts that mirrored the terms of the agreement that Gap and Gabbana would negotiate. Well, clearly, Gabbana would want to have a deal with Gap that would be satisfactory to Roots under their letter of understanding. I don't see how that makes Gabbana or any of its employees an agent of Roots. Help me make that connection. Because Roots Mr. Abuisa testified at his deposition that he understood that in negotiating these contracts, even though Roots had an interest in the contracts, Gap only wanted to deal with one party as the negotiator. And they agreed that Mr. Larson would negotiate those contracts on behalf of the collective entity that would get the rewards of this sale of inventory from Gap to Gabbana to Roots. And we have the written document wherein Roots transmits to Mr. Larson the proposal that they would be willing to enter into and requests him to transmit that to Gap, as well as repeated statements that Mr. Larson, in fact, was representing Roots' interest in that negotiation, understanding that Roots would only be able to get whatever distribution rights Gabbana had succeeded in getting from Gap. Now, is there something special about this arrangement, or could you make that same argument for any three-party deal? I think the special thing about this arrangement is that you have a written contract between Roots and Gabbana that explicitly references these written agreements to be entered into between Gabbana and Gap, and the fact that Roots will then enter into mirror agreements that reflect those same terms. They were ultimately the ones paying for the excess inventory. They made that payment through Gabbana pursuant to the terms of the written contracts that had been executed and received the goods back from Gabbana pursuant to, again, the terms of that written contract. So they initially attempted to plead a third-party beneficiary theory in this case, contending that Roots was a third-party beneficiary of the contracts between Gap and Gabbana. The district court rejected that theory, contending that Roots's argument that it was intended to be a subdistributor was prohibited by the explicit terms of the contract between Gap and Gabbana, which is when Roots changed its story and then contended that, in fact, it had this separate and distinct oral agreement that was separate from the written contracts that the parties had entered into. The test for actual authority is satisfied here. The test for ostensible authority is also satisfied. Again, there was uncontradicted evidence in the record, setting aside Mr. Abu-Isa's declaration that he submitted in opposition to summary judgment, that Gap wanted to deal with one party to the negotiations and understood that the parties had agreed that that one entity would be Mr. Larson. And in that circumstance, even if the Court were to find that there was not actual authority for Mr. Larson to represent Roots's interest in that negotiation, he certainly had ostensible authority. Just one last question, I guess, and then I'll let it go. But say that we agree that Larson had actual and or ostensible authority. So it would have the authority to bind Roots. That's what an agent's actual or ostensible authority. But, in fact, he didn't bind Roots to anything. And I don't really understand your argument being that Larson bound Roots to anything. I mean, that could be relied upon by another party to the contract. So I'm not sure I understand where this argument is leading. I think where it goes, Your Honor, is that Roots cannot then contend that there was some separate oral agreement directly with Gap that contradicts the terms of this written contract that was negotiated between Gap and Gabbana with the participation of their agent, and which they understood would then derivatively embody what their rights would be. The record is also replete with evidence that Roots understood that it had no rights greater than the rights that it derived from the Gap-Gabbana contract. That is reflected in the agreements that Roots turned around and executed with other entities such as A.A. Turkey, in which it referred to itself as being a subdistributor of Gabbana. It's also reflected in Roots' original allegations in its original complaint that Gap terminated its relationship with Roots by terminating its contract with Gabbana, Roots' ultimate distributor, and that because Roots had no greater rights than it could get through the Gap-Gabbana arrangement, that effectively terminated Roots' rights as well. I think the third basis on which this Court could affirm the judgment is ratification. After the execution of the written agreements, the parties proceeded to operate in conformity with those written agreements. Payment for the merchandise was made from Roots to Gabbana and then from Gabbana to Gap, consistent with the terms of the written contract. Product was likely sold from Gap to Gabbana and then from Gabbana to Roots. In addition, the chain of communications all passes through Gabbana, again, consistent with the requirements of the written contract which established this distributorship relationship. If we got to ratification, why would that be appropriate for summary judgment? Because the factual predicate for ratification is undisputed. It is undisputed that the parties consistently acted in conformity with the written contract. It is undisputed that in each and every instance, payment was made from Roots to Gabbana, not from Roots to Gap. It is also undisputed that in each and every instance, Gap sold product to Gabbana and never made any direct sale of product to Roots. The only transaction that Roots attempts to point to to create a disputed issue of fact is that the inventory was shipped to Roots's warehouse in Dubai. But Gap witnesses testified that they understood Roots to be acting as a distribution facility for Gabbana, pursuant to the terms of the written agreement. And so there was no conflict in the evidence placed in the record with respect to the significance of that shipment. Roberts. Do you mind if we turn for a second to the unfair trade practice claim? California law on 17-200 has been, I don't know, for an outsider it's difficult to discern. But it seems to me, if you look at the cases, that if you have non-competing business entities, and we're considering the unfairness prong, do we really need to be tethered to a violation of public policy or law any more under 17-200? So I agree with the Court that we have clear pronouncements with respect to consumer cases and clear pronouncements with respect to competitor cases. And we have a gray zone in the middle where we have two sophisticated business entities who are not competitors, but nor do they have the type of unequal relationship that we see in those cases that treat the 17-200 as a consumer protection statute. The policies that the California Supreme Court was relying on in the Celtec case I think are equally applicable here, that we need something to define what the boundaries of unfair conduct would be. And I think for that reason, even though the Celtec case did not directly address these other types of business relationships, I think the reasoning of that case applies equally here as a threshold matter. But even otherwise, I think the rule is with non-competing businesses and the unfairness prong. That perhaps there doesn't have to be an incipient or threatened violation of the antitrust laws, but it would still need to be tethered or tied to some other violation of law rather than simply the Court's subjective assessment of what might be unfair in this business transaction. I also think, though, the Court doesn't need to reach that question in order to resolve this case. Because under the Home Depot case, for example, I think it is clear, regardless of the standard that's applied, that a practice cannot be deemed unfair when it is explicitly permitted by the contractual relationship between the parties. And here we do GAAP was exercising its contractual rights. That is the conduct that Roots complains of as being unfair. And the courts have, I think, been fairly consistent in saying that courts cannot use 17-200 as a way to rewrite parties' contractual obligations. What about the theory that Roots raises that GAAP said, we'll do this sort of quid pro quo, you buy the $6 million worth of off-season merchandise and we'll work with you on an ISP, but then in some later testimony says, well, were they alleged? Well, this is just to protect our IP rights. We're not really serious about it. And so that doesn't seem to be something expressly contemplated by the agreements. Well, the first part of that, Your Honor, I think is simply a way to try to avoid the application of the parole evidence rule. And were it the case that one could state a 17-200 claim predicated on the argument that statements that are not admissible by virtue of the parole evidence rule create unfairness in the parties' contractual relationship, that would really undermine the purposes of 17-200. I mean, that would really undermine the purposes of the parole evidence rule in ensuring that the written contract is the thing that defines the parties' contractual obligations. With respect to the purposes of the ISP program, the testimony is simply that GAAP witnesses said that from GAAP's perspective, the purpose of the ISP program in the context of GAAP's large international operations was not primarily to drive revenue. But that doesn't have anything to do with whether Roots would have had the opportunity to be successful in opening stores as an ISP distributor for Roots, for GAAP. Any further questions? I think we have the argument, ma'am. Thank you. Put on the two minutes. Thank you. Excuse me just one second. Two minutes. Thank you. Your Honor, with respect to 17-200, the statute is written explicitly in the disjunctive and it says unlawful or unfair. So let's take the unfair prong. Let's assume, and let's assume that you have to have it tethered to some violation of law. What's a violation of law here? Well, there is none. So I guess we have to show that there's the tethering requirement applies to or the – I'm sorry. I'm getting myself backwards. But that you can proceed under 17-200 absent any public policy against noncompeting commercial entities. I'm not sure that makes sense to me. Yes, Your Honor. There is a standard in California consumer cases that's very clear for what unfair means, and it's completely independent from unlawful. I understand that. I understand the consumer cases. I'm just wondering why we should apply the consumer standard to cases involving noncompeting commercial entities that are supposedly of relative sophistication. Because that's what the legislature said, Your Honor. It didn't say – it didn't limit it to consumer cases. It didn't limit it at all. The California Supreme Court has now limited it in cases between competitors, but this Court should not be expanding that limitation when there's an explicit statement by the California legislature that an unlawful – that unlawful stands on its own. It wrote, the legislature wrote, unfair, unlawful or unfair. This is why I asked you my hypothetical. I wanted you to assume, Arguendo, you had no contract claim and no quasi-contract claim, okay? So if you have no quasi-contract claim as well as no contract claim, what does the unfair claim add in this kind of commercial context? Well, it would be the same – the same standard as in other unfair cases under the 17-200. It's a – the test of whether a business practice is unfair, quote, involves an examination of the practice's impact on the alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the Court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim. The Court could take into account a number of things that are in the record. For example, Jim Bell's statement, two routes, after the Gabbana Agreements were signed between Gap and Gabbana, that notwithstanding those agreements, we're still going to follow through on the oral agreement, which – which induced routes to actually pay the money. But if that were true, wouldn't that be a quasi-contract claim? I don't know, Your Honor. I don't know if it's a quasi-contract claim or not. I think it's an unfair practice that's prohibited by the legislature under 17 – 17-200. Basically, what we're saying – So we don't have – if it's not – if it's not tethered to a law and it's not tethered to contract, what standards are courts supposed to employ in deciding what's fair or not in a particular context? Well, I – I mean, that's a – There are – there are cases, and that's – that's one that I just read. And I understand that certain courts have been troubled by this, but that is what the legislature has written. And I would submit, Your Honor, that if – if that is going to be limited, it should be done so by the California courts. We could – we could certainly certify it. I understand that. But it's a bit troublesome. Well, anyway, I think we've heard your answer on that. And I – we – you have another question? No. I'm afraid I jumped in with your argument and cut you off, so I'll give you a little more time. Okay. The – some of the factual things that really need to be understood here, because Ms. Drury was sort of focusing on the idea of representation and the relationship between these two agreements. Now, I think that you really need to understand, or the Court really needs to understand, what's going on here, which is GAP coming to Roots. Gabana has no ability whatsoever to do this transaction. GAP knew from the very beginning that the only place it was going to get the $6 million for this inventory was from Roots, that that was going to be a back-to-back transaction. And it knew that the only place that – that the only entity that could dispose of that inventory was Roots. It says that it expected, under its agreements with Gabana, that Roots was just going to be a sub-distributor for Qatar, but it knew that Roots was paying for 1.74 million pieces of inventory, where the population of Qatar at that time was about a million people. The reality here – and this is why I've tried to stress that this is a factual determination – the reality here is that from the very beginning, GAP knew that Roots was the principal here, and Roots would be executing this transaction, buying this inventory, and running the show. And there is ample, ample evidence in the record of that. Mr. Abu-Is' deposition, while there are some issues for us in it, preserves that position, and then in his affidavit, he expands upon it and explains what's really going on. So there is an underlying business arrangement here. GAP chose to do it through Gabana. It could fulfill its obligations however Roots wanted to do it. And while Roots may have had some knowledge of what was going on between GAP and Gabana in those negotiations, it never took the position that GAP could bind Roots and that Roots would be contractually bound. And, in fact, Ms. Drury has never taken that position herself. So there's this negotiation that's kind of out there between Roots, between GAP and Gabana. They enter into a contract. Roots walks away from it immediately, refuses to sign the back-to-back contract, and communicates directly with GAP and says, look, this is inconsistent. We want our deal. And Jim Bell says to him, no, our deal still applies. By the way, we haven't mentioned the estoppel argument here, which is Jim Bell's statement to Mr. Abu-Is' where he says to him, no, the Roots' oral agreement with GAP still applies after the Gabana agreement was signed. Makes it impossible for them to now try to go back to that Gabana agreement and use that to block Roots, because we relied, Roots relied on that statement by Mr. Bell, and that's an important additional argument. Roberts. Thank you. Thank you both for your arguments. The case is currently submitted, an interesting case.
judges: Restani, Thomas, Ikuta